UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXCAS
SHERMAN DIVISION

| | | |
|---|---|---|
| JANET TOTH, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | |
| SPECIALIZED SECURITY | § | |
| SERVICES, INC. | § | |
| | § | |
| *Defendant.* | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Plaintiff, Janet Toth, complaining of Defendant, Specialized Security Services, Inc., and for cause of action would show the Court as follows:

**I.**
**PARTIES**

1. Plaintiff Janet Toth ("Toth" or "Plaintiff") is an individual who resides in Frisco, Collin County, Texas.

2. Defendant Specialized Security Services, Inc., ("S3" or "Defendant") a corporation with its principal office in Plano, Collin County Texas may be served with process through its registered agent for service of process, Mitchelle Schanbaum 4975 Preston Park Blvd. Suite 510, Plano, Texas 75093.

**II.**
**JURISDICTION**

3. This court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331.

## III.
## VENUE

4. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Collin County, Texas.

## IV.
## EXHAUSTION OF ADMINISTRATIVE REMEDIES

5. Toth has fully exhausted her administrative remedies under Title VII and has fulfilled all jurisdictional prerequisites to the filing of these claims. Toth timely filed an employment discrimination charge against Defendant with the Equal Employment Opportunity Commission (EEOC). On June 12, 221, the EEOC issued Toth a Notice of Right to Sue. Toth has filed this action within 90 days from her receipt of such notice.

## V.
## FACTS

6. At all times relevant to this action, S3 Corporation, Inc., had approximately seventy employees.

7. Toth is a Korean female.

8. Toth first started working for S3 as a Client Administrator on April 24, 2015. Toth was promoted four times over a five-year period eventually holding the dual role of Security Assessor and Client Administrator Manager. She received an annual pay increase in September of 2019 based upon her performance.

9. Toth supervised a team of six client administrators and received no warnings or written discipline prior to January of 2020. Toth also designed and implemented a training program for the client administrators and assessors and S3 instructed new employees to shadow Toth as a part of their training.

10. Toth had a great relationship with her clients many of whom requested that Toth be assigned permanently to their contract. Toth developed an employee incentive sales lead program which rewarded employees for up-selling customers. This program was implemented and used by S3 for a number of years.

11. Toth received a quarterly bonus for twelve consecutive quarters for meeting her billing revenue requirements. In December of 2016, Toth received an employee performance award which was only awarded to approximately six employees in the whole company.

12. In 2018, Toth held the position of Junior Security Assessor earning approximately $64,000 a year. Toth learned that two people who were recently hired to the same position were earning more money than she was. April White ("White") told Toth directly what she was earning (which was significantly more than Toth) and that she felt Toth was underpaid. Additionally, Josh Barton ("Barton") did not tell Toth exactly what he was making but told her specifically that he was paid more than she was and that he thought she was underpaid given her tenure with the company. Both White and Barton are Caucasian. They both urged Toth to ask for more money.

13. Toth took her concerns to Senior Vice President of Compliance and Security Services, John Knight ("Knight"). Knight promised to address Toth's concerns directly with CEO Mitchelle Schanbaum ("CEO Schanbaum"). Knight later reported back to Toth that CEO Schanbaum had denied that White and Barton were paid more than her and refused to give Toth a raise. CEO Schanbaum specifically told Knight that White was a liar.

14. Toth complained to Knight on several occasions that she felt she was underpaid given her position, tenure with the company and the sheer amount of work she performed in contrast to her comparators. Knight agreed that he felt Toth was underpaid and assured her that he

was continuing to push for her to be given pay equity. Surprisingly, even after Toth was promoted to the dual role of Security Assessor and Client Administrator Manger, she was not paid at the same level as White. Upon information and belief, Toth was consistently paid less than her Caucasian comparators.

15. Additionally, Chief Operating Officer Scott Schanbaum (" COO Schanbaum") made numerous racist and derogatory comments about Toth's Korean heritage often in front of others. Throughout Toth's work with the company, Scott asked Toth if she was from North Korea and if she had defected. He would suggest that Toth personality, work ethic etc. were the result of being raised in North Korea. In early 2019, Toth got a haircut and Scott asked her if the hair cut was one of the approved Kim Jong Il haircuts. In mid-2019, Scott introduced Toth to a temporary worker named Matthew Clay and told him that Toth was their resident North Korean. Clay approached Toth later and told her that he had never met anyone from North Korea, forcing Toth to explain that this was not accurate and was a tasteless joke. Scott made these inappropriate racially derogatory comments in front of Renee Stanphill, Tom Sipes, and Knight among others.

16. On January 29, 2020, Toth was working from the office despite not feeling well. She had generalized body pain and numbness and eventually fell out of her chair. Toth's fall was witnessed by several client administrators. Toth called her husband and asked him to pick her up because she did not feel well enough to drive herself home. Her husband insisted on taking Toth to the emergency room. Toth was admitted to the hospital and eventually diagnosed with multiple sclerosis.

17. Toth was on sick leave for approximately six weeks during recovery and also underwent numerous diagnostic tests and doctor's appointments. When Toth was ready to return to

work, S3 requested a doctor's note indicating that Toth was cleared to return to work.  Toth submitted notes from her cardiologist and neurologist.  Toth's neurologist included a list of medical accommodations as a condition of returning to work.  The accommodations requested were a computer screen protector, ergonomic chair, and the ability to wear comfortable shoes.

18. When Toth returned to work on March 12, 2020, she met with Controller Terra Troia ("Troia").  Troia was defensive about the cost of the accommodations requested by Toth's physician.  She informed Toth that the computer screen protector would cost S3 $300 and asked how quickly Toth would need the item.  Toth assured Troia that she did not need the items immediately.  Troia told Toth that they would also not be able to get the chair quickly and suggested that S3 would provide both items after they completed the upcoming office move.  Toth suggested to Troia that Senior Vice President of Operations Jack Miller ("Miller") would probably give Toth his chair when he left the firm as he had recently given notice of resignation.

19. Following this meeting, Toth met with CEO Schanbaum, who unexpectedly removed three of Toth's direct reports and told her that she were going to "help you out" by decreasing Toth's workload and cutting her team in half.  CEO Schanbaum also warned Toth that her direct report Katie Conly ("Conly") was a known gossip and that Toth should avoid talking to her.  Toth responded that she thought it would be impossible to not talk to an employee that she supervised.  CEO Schanbaum responded and said, "just don't gossip" and Toth agreed to avoid gossiping with Conly.  Toth found the entire exchange about Conly to be odd since she had supervised Conly for approximately seven months and found her to be solid performer.

20. CEO Schanbaum further said that she had personally cleaned out Toth's desk while she was on leave and chastised Toth stating that the amount of snack food she had in her desk was inappropriate.  Toth reminded CEO Schanbaum that she is a diabetic and needs the snack food because she often is too busy to take lunch and needs sugary foods available to guard against low blood sugar.  CEO Schanbaum then told Toth that she needed to clean out her desk and instruct everyone else to clean out their desks.  Finally, CEO Schanbaum informed Toth that Miller was going to be walked out later that day.

21. Toth returned to work, but she was scheduled to leave in the early afternoon for a previously scheduled appointment.  As Toth was leaving the office, Conly asked Toth if she could attend a client call the next day at 9:00 a.m.  Toth called Conly back from her car to discuss the schedule for the next day and tell her that she would not be able to attend the client call.  Conly then told Toth that Miller was being walked out.  Toth feigned surprise and said, "oh I am sad I am not going to get to say goodbye, just like I didn't get to say goodbye to Chelsey." (An employee who had recently given notice while out on maternity leave).  Conly responded and said, "Oh yea Chelsey too."  Toth felt that she had successfully sidestepped the conversation and avoided engaging in gossip with Conly.

22. The next day, March 13, Troia met Toth at the door at the beginning of the day and terminated her.  Troia told Toth, "did you or did you not talk to Katie yesterday after you were told not to?"  Toth responded and said "of course I talked to her.  I am her supervisor, and I don't know how I cannot talk to her."  Troia then told Toth "you disobeyed a direct order of your CEO and that created a hostile work environment."

23. Toth believed the reason Troia provided for her termination was untrue since she had not received any previous discipline, S3 made no attempt to investigate the content of her

conversation with Conly and to the best of Toth's knowledge Conly was never disciplined for the same phone call. Toth feels the real reason was her Race/National Origin, recent MS diagnosis and requested accommodations. Unfortunately given the timing of Toth's termination she found herself, unemployed with a newly diagnosed disability at the beginning of a pandemic.

## VI.
## CAUSE OF ACTION

### Count One – Title VII and 42 U.S.C. §1981 Race/National Origin Discrimination

24. Plaintiff incorporates by reference paragraphs 6-23, as though fully set forth herein.

25. At all times material to this action Defendant was an "employer" as defined by 42 USC § 2000 b. Defendant is therefore subject to the provisions of Title VII and 42 USC § 1981.

26. Plaintiff was qualified for her position as evidenced by her tenure with S3 and performance history. Defendant treated Plaintiff differently than employees of other races and national origins by paying her significantly less than her Caucasian comparators. Defendant took such adverse action because of Plaintiff's race/national origin.

27. COO Schanbaum's comments and jokes regarding Toth's race and national origin provide support that Toth's race and national origin were the reason for her dissimilar treatment.

28. Additionally, by terminating Plaintiff, Defendant took an adverse action against her. Defendant took such adverse action because of Plaintiff's race and national origin.

29. Through Defendant's supervisors, and/or employees, in a continuing course of conduct, Plaintiff was subjected to negative treatment, less pay and was terminated because of her race/national origin, Korean.

30. Defendant's actions, as described herein, constitute unlawful discrimination on the basis of Plaintiff's race and national origin, in violation of Title VII and 42 U.S.C. § 1981.

### Count Two –Americans with Disability Act – Disability

31. Plaintiff incorporates Paragraphs 6 – 23 as though fully set forth herein.

32. At all times material to this action Defendant was an "employer" as defined by 42 USC § 12111(5)(A).  Defendant is therefore subject to the provisions of the Americans with Disabilities Act.

33. Plaintiff's medical conditions limited her ability to eat, walk, sit and work within the meaning of 42 USC § 12102.

34. She was qualified for her position as evidenced by her tenure with S3 and performance history. By terminating Plaintiff, Defendant took adverse action(s) against her.

35. Defendant took such adverse action because of Plaintiff's disability and requests for accommodation.

### Count Three–Americans with Disability Act – Failure to accommodate

36. Plaintiff incorporates Paragraphs 6 – 23 as though fully set forth herein.

37. At all times material to this action Defendant was an "employer" as defined by 42 USC § 12111(5)(A).  Defendant is therefore subject to the provisions of the Americans with Disabilities Act.

38. Plaintiff's medical condition limited her ability to eat, walk, sit and work within the meaning of 42 USC § 12102.

39. She was qualified for her position as evidenced by her tenure with S3 and performance history and could have continued to work with reasonable accommodations.

40. Defendant failed to accommodate Plaintiff or to engage in the interactive process.

## VII.
## PRAYER

41. Plaintiff respectfully requests that this Court grant the following relief from Defendant:

A. A declaratory judgment, declaring Defendant's past practices herein complained of to be unlawful;

B. Back pay, front pay, pension benefits, stock options, bonuses, health benefits, and any other relief necessary to compensate Plaintiff;

C. punitive damages;

D. Prejudgment and post-judgment interest;

E. Attorney's fees necessary for prosecution of Plaintiff's claims;

F. Costs for the prosecution of Plaintiff's claims, including the costs of expert witness fees; and

G. Such other general relief to which Plaintiff shows herself justly entitled.

## VIII.
## JURY DEMAND

42. Plaintiff requests that all ultimate fact issues be submitted to a jury for determination. She has paid the jury fee.

Respectfully Submitted,

_____
Jane Legler
Texas Bar No. 03565820
Christine Neill
Texas Bar No. 00796793
Kyla Gail Cole
Texas Bar No. 24033113

Neill Legler Cole PLLC
3300 Oak Lawn Ave. Ste. 425
Dallas, Texas 75219
(214) 748-7777
(214) 748-7778 (facsimiles)
christine@nlcemployeelaw.com
jane@nlcemployeelaw.com
kyla@nlcemployeelaw.com